UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

RAFAEL RIVERA, Sr., MARIA RIVERA, individually and o/b/o minor K.R.; SAMUEL RAMOS, MONICA JADEJA RAMOS, individually and o/b/o minor T.R.; JOSE RIVERA, MIGDALIA RAMOS-RIVERA, individually and o/b/o minors "Jo.R." and "Ju. R." and RAFAEL RIVERA, Jr.,

**COMPLAINT**

14 cv 5148

Jury Trial Demanded

ECF Case

PLAINTIFFS,

-against-

CITY OF NEW YORK; Police Officer JAVIER APONTE, (Shield No. 11268); Police Officer SOLMONSOHN, (Tax No. 933374); Sgt. THOMAS, (Tax No. 926370); JOHN and JANE DOE POLICE OFFICERS #1 through 15, individually and in their official capacities (the names John and Jane Doe being fictitious, as the true names are presently unknown); Child Protective Specialist FANCINE ALLMAN, and JOHN and JANE DOE ACS DEFENDANTS #1 through 15, individually and in their official capacities (the names John and Jane Doe being fictitious, as the true names are presently unknown);

Defendants.

----------------------------------------------------------------------x

PLAINTIFFS RAFAEL RIVERA, Sr., MARIA RIVERA, individually and o/b/o minor K.R.; SAMUEL RAMOS, MONICA JADEJA RAMOS, individually and o/b/o minor T.R.; JOSE RIVERA, MIGDALIA RAMOS-RIVERA, individually and o/b/o minors "Jo.R." and "Ju. R." and RAFAEL RIVERA, Jr., by their attorney, Katherine E. Smith, Esq., complaining of the defendants, respectfully alleges as follows:

## NATURE OF THE ACTION

1.      PLAINTIFFS bring this action for compensatory damages, punitive damages and attorneys' fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for violations of their civil rights, by defendants THE CITY OF NEW YORK ("City"); New York City Police Department

("NYPD") Police Officer JAVIER APONTE, (Shield No. 11268) ("APONTE"); Police Officer

SOLMONSOHN, (Tax No. 933374); Sgt. THOMAS, (Tax No. 926370); P.O.s JOHN/JANE

DOE #1-15 ("POLICE DOE DEFENDANTS"); and Child Protective Specialist FANCINE

ALLMAN, Administration of Children's' Services ("ACS") JOHN/JANE DOE #1-15 ("ACS

DEFENDANTS") as said rights are secured by said statutes and the Constitutions of the State of

New York and the United States.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First,

Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

3.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and

1367.

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c), in that

this is the District in which the claim arose.

## JURY DEMAND

5.     PLAINTIFFS demand a trial by jury in this action.

## PARTIES

6.     PLAINTIFFS RAFAEL RIVERA, Sr., MARIA RIVERA, individually and o/b/o

minor K.R.; SAMUEL RAMOS, MONICA JADEJA RAMOS, individually and o/b/o minor

T.R.; JOSE RIVERA, MIGDALIA RAMOS-RIVERA, individually and o/b/o minors "Jo.R."

and "Ju. R." and RAFAEL RIVERA, Jr., were at all relevant times, residents of Kings County in

the City and State of New York.

7.     Defendant CITY is a municipal corporation organized under the laws of the State

of New York.

8.      Defendant CITY, maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of defendant City. The NYPD is responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

9.      Defendant Police Officer JAVIER APONTE (Shield No. 11268), Police Officer SOLMONSOHN, (Tax No. 933374); and Sgt. THOMAS, (Tax No. 926370) at all times relevant herein, were officers, employees and agents of the NYPD.   Defendants APONTE, SOLMONSOHN, THOMAS are sued in their individual and official capacities.

10.     At all times relevant defendants JOHN/JANE Does #1-15 were police officers, detectives or supervisors employed by the NYPD.  PLAINTIFFS do not know the real names and shield numbers of the POLICE DOE DEFENDANTS #1-15.

11.     Defendant City's ACS, is authorized by New York State law to investigate complaints of child abuse and neglect and to offer rehabilitative and preventive services to children and parents.  Children removed from their custodians are in the legal custody of ACS and its Commissioner MATTINGLY.

12.     At all times relevant hereto, Defendant CITY, acting through ACS, was responsible for the policy, practice, supervision, implementation, and conduct of all ACS matters and was responsible for the appointment, training, supervision, and conduct of all ACS personnel. In addition, at all relevant times, Defendant CITY was responsible for enforcing the rules of the ACS, and for ensuring that the ACS personnel obey the laws of the United States and of the State of New York.

13.     Upon information and belief, Child Protective Specialist, FANCINE ALLMAN, and ACS DEFENDANTS JOHN/JANE DOES #1-15 (collectively "ACS DEFENDANTS") were employed by Defendant City as caseworkers /supervisors for ACS. PLAINTIFFS do not know the real names of the ACS DOE DEFENDANTS #1-15.

14.     The ACS DEFENDANTS were at all times relevant herein officers, employees and agents of the ACS. The ACS DEFENDANTS are being sued in their official and individual capacities.

15.     At all times relevant herein, ACS DEFENDANTS were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of ACS, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. The ACS DEFENDANTS were each acting for and on behalf of ACS at all times relevant herein, with the power and authority vested in them as officers, agents, and employees of ACS and incidental to the lawful pursuit of their duties as officers, employees and agents of the ACS.

16.     At all times hereinafter mentioned, the defendants APONTE, and JOHN & JANE DOES #1-15 NYPD OFFICERS (collectively "POLICE DEFENDANTS"), and ACS DEFENDANTS, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

17.     Each and all of the acts of the POLICE DEFENDANTS and ACS DEFENDANTS alleged herein were done by said DEFENDANTS while acting within the scope of their employment by defendant City of New York.

## STATEMENT OF FACTS

18.     On or about September 1, 2011, at approximately 4:00 a.m., PLAINTIFFS were lawfully within 224 Milford Street, Brooklyn, New York.

19.     PLAINTIFFS resided in separate apartments within 224 Milford Street (the "Milford Home"), a lawfully sub-divided, three-family home.  The Milford Home contained a Basement Apartment, First Floor Apartment, and Second Floor Apartment.

20.     Each apartment maintained a separate entrances/exits. Any doors connecting the separate apartments were locked, preventing entrance and egress between the respective apartments.

21.     On or about September 1, 2011, at approximately 4:00 a.m., PLAINTIFFS were asleep in their respective apartments within the Milford Home when several unidentified New York City Police Officers, JOHN/JANE DOES #1-15, defendants APONTE, SOLMONSOHN, and THOMAS, unlawfully entered their respective Apartments.

22.     The POLICE DEFENDANTS did not possess any search warrant, there were no exigent circumstances excusing a warrantless entrance, and PLAINTIFFS did not consent to the POLICE DEFENDANTS' entrance and subsequent search of their respective Apartments.

**Basement Apartment – Plaintiff, RAFAEL RIVERA, Jr.**

23.     Plaintiff RAFAEL RIVERA, Jr., resided in the Basement Apartment along with two non-parties herein.

24.     On the above date and time, POLICE DEFENDANTS unlawfully entered, and searched the Basement Apartment.

25.     The POLICE DEFENDANTS falsely claimed to have recovered contraband from within the Basement Apartment.

26.     Notwithstanding the fact that they lacked any probable cause, the POLICE DEFENDANTS, including APONTE, SOLMONSOHN, and THOMAS unlawfully arrested Plaintiff RAFAEL RIVERA, Jr.

27.     Moreover, the POLICE DEFENDANTS beat and used excessive force to falsely arrest Plaintiff RAFAEL RIVERA, Jr., injuring him about the face, body and head.

28.     Plaintiff RAFAEL RIVERA, Jr., was then taken to a police precinct. At the precinct, POLICE DEFENDANTS, including defendant APONTE falsely informed employees of the Kings County District Attorney's Office that they had observed plaintiff commit several crimes and offenses.

29.     DEFENDANTS did not observe Plaintiff RAFAEL RIVERA, Jr., commit any crimes or offenses.

30.     Plaintiff RAFAEL RIVERA, Jr., was then taken to Brooklyn Central Booking, and was arraigned in Kings County Criminal Court.  His case was assigned docket number 2011KN070377.

31.     Plaintiff RAFAEL RIVERA, Jr., was sent to Rikers Island for an extended period of time before he was released from custody. His criminal case was subsequently dismissed.

**First Floor Apartment:  RAFAEL RIVERA, Sr.; MARIA RIVERA, and Minor "K.R."**

32.     Plaintiff RAFAEL RIVERA, Sr. (then age 65), and his wife, Plaintiff MARIA RIVERA (then age 65) resided in the First Floor Apartment, along with their granddaughter, minor Plaintiff "K.R."  At all relevant times herein, MARIA RIVERA was/is the legal guardian of minor Plaintiff "K.R."

33.     On the above date and time, POLICE DEFENDANTS unlawfully entered, and searched the First Floor Apartment.

34. The POLICE DEFENDANTS falsely claimed to have recovered contraband from within the First Floor Apartment.

35. Notwithstanding the fact that they lacked any probable cause, the POLICE DEFENDANTS including APONTE, SOLMONSOHN, and THOMAS unlawfully arrested PLAINTIFFS RAFAEL RIVERA, Sr. and MARIA RIVERA.

36. PLAINTIFFS RAFAEL RIVERA, Sr. and MARIA RIVERA were taken to a police precinct. At the precinct, POLICE DEFENDANTS, including defendant APONTE falsely informed employees of the Kings County District Attorney's Office that they had observed PLAINITFFS commit several crimes and offenses.

37. DEFENDANTS did not observe PLAINTIFFS RAFAEL RIVERA, Sr. and MARIA RIVERA commit any crimes or offenses.

38. PLAINTIFFS RAFAEL RIVERA, Sr. and MARIA RIVERA were then taken to Brooklyn Central Booking and were arraigned thereafter. RAFAEL RIVERA, Sr.'s case was assigned docket number 2011KN070379.

39. PLAINTIFFS RAFAEL RIVERA, Sr. and MARIA RIVERA were in custody for approximately 24 hours. Their cases were subsequently dismissed.

40. RAFAEL RIVERA, Sr. and MARIA RIVERA's custodial rights and rights to familial association were disrupted.  Minor plaintiff "K.R." was unlawfully removed from her grandparents/guardians' and her home, due to the false claims of the POLICE DEFENDANTS and ACS DEFENDANTS.

41. Upon information and belief, an ACS Petition was filed against RAFAEL RIVERA, Sr. and MARIA RIVERA and they were forced to undergo ACS Proceedings, *inter*

*alia*, in order to see their granddaughter "K.R" In fact, "K.R." was removed from their care and placed into non-kinship foster care.

**Second Floor Apartment:**

> **A.)  JOSE RIVERA, MIGDALIA RAMOS-RIVERA, &  Minors Jo.R." & "Ju.R."**

42.     Plaintiff JOSE RIVERA, and his wife, Plaintiff MIGDALIA RAMOS-RIVERA resided in the Second Floor Apartment, along with their children, minor Plaintiff "Jo.R." and minor Plaintiff "Ju.R." At all relevant times herein, MIGDALIA RAMOS-RIVERA was/is the legal parent/guardian of minor PLAINTIFFS "Jo.R." and "Ju.R."

43.     On the above date and time, POLICE DEFENDANTS unlawfully entered, and searched and the Second Floor Apartment.

44.     The POLICE DEFENDANTS falsely claimed to have recovered contraband from within the Second Floor Apartment.

45.     Notwithstanding the fact that they lacked any probable cause, the POLICE DEFENDANTS including APONTE, SOLMONSOHN, and THOMAS unlawfully arrested JOSE RIVER and MIGDALIA RAMOS-RIVERA.

46.     PLAINTIFFS JOSE RIVERA and MIGDALIA RAMOS-RIVERA were taken to a police precinct. At the precinct, POLICE DEFENDANTS, including defendant APONTE falsely informed employees of the Kings County District Attorney's Office that they had observed PLAINTIFFS commit several crimes and offenses.

47.     DEFENDANTS did not observe JOSE RIVERA and MIGDALIA RAMOS-RIVERA commit any crimes or offenses.

48.     PLAINTIFFS JOSE RIVERA and MIGDALIA RAMOS-RIVERA were then taken to Brooklyn Central Booking.

49.     PLAINTIFFS JOSE RIVERA and MIGDALIA RAMOS-RIVERA were in Police Custody for approximately 24 hours. JOSE RIVERA's was assigned arrest number K11684772.

50.     Upon information and belief, the Kings County's District Attorney's Office declined to prosecute the cases of JOSE RIVERA and MIGDALIA RAMOS-RIVERA.

51.     JOSE RIVERA and MIGDALIA RAMOS-RIVERA's custodial rights and rights to familial association were disrupted.   PLAINTIFFS "Jo.R." and "Ju.R." were unlawfully removed from their parents and her home, due to the false claims of the POLICE DEFENDANTS and ACS DEFENDANTS.

52.     Upon information and belief, an ACS Petition was filed against JOSE RIVERA and MIGDALIA RAMOS-RIVERA, and they were forced to undergo multiple ACS Proceedings, and supervised visits, *inter alia*, in order to see, and ultimately regain custodial rights, of their children "Jo.R." and "Ju.R."

**B.)     SAMUEL RAMOS, MONICA JADEJA-RAMOS & Minor "T.R."**

53.     Plaintiff SAMUEL RAMOS, and his wife, Plaintiff MONICA JADEJA-RAMOS resided in the Second Floor Apartment, along with their child, minor Plaintiff "T.R."  At all relevant times herein, MONICA JADEJA-RAMOS was/is the legal parent/guardian of minor "T.R."

54.     On the above date and time, POLICE DEFENDANTS unlawfully entered, and searched and the Second Floor Apartment.

55.     The POLICE DEFENDANTS falsely claimed to have recovered contraband from within the Second Floor Apartment.

56.     Notwithstanding the fact that they lacked any probable cause, the POLICE DEFENDANTS including APONTE, SOLMONSOHN, and THOMAS unlawfully arrested PLAINITFFS.

57.     PLAINTIFFS SAMUEL RAMOS and MONICA JADEJA-RAMOS were then taken to a police precinct. At the precinct, POLICE DEFENDANTS, including defendant APONTE falsely informed employees of the Kings County District Attorney's Office that they had observed PLAINTIFFS commit several crimes and offenses.

58.     At no time did POLICE DEFENDANTS observe SAMUEL RAMOS and MONICA JADEJA-RAMOS engaged in any unlawful behavior.

59.     PLAINTIFFS SAMUEL RAMOS and MONICA JADEJA-RAMOS were then taken to Brooklyn Central Booking.

60.     PLAINTIFFS SAMUEL RAMOS and MONICA JADEJA-RAMOS were in Police Custody for approximately 24 hours.

61.     Upon information and belief, the Kings County's District Attorney's Office declined to prosecute the cases of SAMUEL RAMOS and MONICA JADEJA-RAMOS.

62.     SAMUEL RAMOS and MONICA JADEJA-RAMOS's custodial rights and rights to familial association were disrupted.  Plaintiff "T.R." was unlawfully removed from his parents and his home, due to the false claims of the POLICE DEFENDANTS and ACS DEFENDANTS, including defendant Child Protective Specialist FRANCINE ALLMAN.

63.     In fact, SAMUEL RAMOS and MONICA JADEJA-RAMOS were forced to move from their home, made to undergo numerous ACS Proceedings, and supervised visits, *inter alia*, in order to see, and ultimately regain custody of their child minor "T.R."

64.     All PLAINTIFFS herein suffered damage as a result of DEFENDANTS' actions. PLAINTIFFS were deprived of their liberty, suffered emotional distress, mental anguish, fear, pain, bodily injury, anxiety, embarrassment, humiliation, and damage to their reputations.

## FIRST CLAIM
### 42 U.S.C. § 1983  Federal Civil Rights Violations

65.     PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

66.     All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

67.     All of the aforementioned acts deprived PLAINTIFFS of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

68.     The acts complained of were carried out by the aforementioned individual DEFENDANTS in their capacities as POLICE OFFICERS, and ACS Employees, with all the actual and/or apparent authority attendant thereto.

69.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as POLICE OFFICERS, and ACS employees, pursuant to the customs, usages, practices, procedures, and rules of the City of New York and the New York City Police Department and ACS all under the supervision of ranking officers of said Departments.

70.     The INDIVIDUAL DEFENDANTS, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice,

procedure or rule of their respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CLAIM
### False Arrest

71.     PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

72.     DEFENDANTS violated the Fourth and Fourteenth Amendments because they arrested PLAINITFFS without probable cause, privilege or consent and caused the MINOR PLAINTIFFS to be removed from their home/parents/guardians, and denied guardians/parents the their rights to associate with their minor children/grandchildren.

73.      As a direct and proximate result of this unlawful conduct, PLAINTIFFS' liberty was restricted for an extended period of time, they were put in fear for their safety, humiliated and subjected to handcuffing, and other physical restraints, without probable cause, in addition to the damages hereinbefore alleged.

## THIRD CLAIM
### Unreasonable Force

74.     PLAINITFFS repeat and reallege each and every allegation as if fully set forth herein.

75.     The DEFENDANTS violated the Fourth and Fourteenth Amendments because they used unreasonable force on PLAINITFFS.

76.     As a direct and proximate result of this unlawful conduct, PLAINITFFS sustained the damages hereinbefore alleged.

**FOURTH CLAIM**
**Malicious Abuse of Process**

77.     PLAINITFFS repeat and reallege each and every allegation as if fully set forth herein.

78.     The POLICE and ACS DEFENDNTS issued legal process to place PLAINTIFFS under arrest and/or remove minor PLAINTIFFS from their parents/guardians/homes and undergo ACS proceedings.

79.     The POLICE and ACS DEFENDNTS arrested PLAINITFFS in order to obtain collateral objectives outside the legitimate ends of the legal process, including to cover up their unlawful entry, search and use of excessive force, *inter alia*.

80.     The POLICE and ACS DEFENDNTS acted with intent to do harm to PLAINTIFFS without excuse or justification.

81.     As a direct and proximate result of this unlawful conduct, PLAINTIFFS sustained, *inter alia*, loss of liberty, loss of earnings, emotional distress, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of their constitutional rights, in addition to the damages herein before alleged.

**FIFTH CLAIM**
**Failure to Intervene**

82.     PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

83.     The POLICE and ACS DEFENDNTS that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

84.     Accordingly, the POLICE and ACS DEFENDNTS who failed to intervene violated the First, Fourth, Fifth and Fourteenth Amendments.

85.     As a direct and proximate result of this unlawful conduct, PLAINTIFFS sustained the damages hereinbefore alleged.

## SIXTH CLAIM
### Denial Of Constitutional Right To Fair Trial

86.     PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

87.     The POLICE and ACS DEFENDNTS created false evidence against PLAINTIFFS.

88.     The POLICE and ACS DEFENDNTS forwarded false evidence to prosecutors in the Kings County District Attorney's office and to ACS Prosecutors.

89.     In creating false evidence against PLAINTIFFS, and in forwarding false information to prosecutors, the POLICE and ACS DEFENDNTS violated PLAINTIFFS' constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

90.     As a direct and proximate result of this unlawful conduct, PLAINTIFFS sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
### Unlawful Entry and Search

91.     PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

92.     DEFENDANTS violated the Fourth and Fourteenth Amendments because they unlawfully entered and searched PLAINTIFFS' residences without a warrant or other cause to do so.  DEFENDANTS also unlawfully searched the bodies of PLAINITFFS.

93.     As a direct and proximate result of this unlawful conduct, PLAINTIFFS sustained the damages herein before alleged.

## EIGHTH CAUSE OF ACTION

94.     PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

95.     Upon information and belief, ACS DEFENDANTS had a policy, custom, usage or practice of removing and detaining children from mothers/grandparents/guardians without probable cause to believe that continuing in the care of their mothers/grandparents/guardians present an imminent danger to the non-adjudicated infant children's life or health, without due process of law, and based upon constitutionally inadequate investigations.

96.     Under this custom, usage, practice or policy, The City of New York:

(a)     encouraged and/or condoned, the removal and detention of children with out due process;

(c)     failed to adequately screen applicants to ACS;

(d)     failed to investigate the removal and detention of children;

(e)     failed to provide adequate training to ACS regarding removal and detention of children;

(f)     failed to adequately supervise ACS employees in their official duties.

(g)     had  a policy to remove children despite the lack of the existence of safety factors.

97.     Acting pursuant to said policy, custom, usage or practice, and without probable cause to believe that continuing case of presented an imminent danger to the child's life or health and without due process of law, and based upon a constitutionally inadequate investigation, Defendants City, POLICE DEFENDANTS, and ACS DEFENDANTS caused ACS employees to enter PLAINTIFFS home(s) and remove INFANT PLAINTIFFS from PLAINTIFFS' custody.

98.     Acting pursuant to said policy, custom, usage or practice, without probable cause to believe that continuing in the care of her mother presented an imminent danger to the child's life or health and without due process of law, and based on a constitutionally inadequate investigation, Defendants City, POLICE DEFENDANTS, and ACS DEFENDANTS detained Infant PLAINTIFFS in government custody, and foster care for an extended period of time.

99.     Said policy, custom, usage or practice, and the removal and detention effectuated pursuant to said policy, custom, usage or practice, constituted an unlawful interference with PLAINTIFFS' liberty interest in her association with her care and custody of their children/grandchildren, the Infant PLAINTIFFS herein, and an unlawful seizure of Infant PLAINTIFFS in violation of the Fourth and Fourteenth Amendments to the United States Constitution.   Said policy, custom, usage or practice, and its implementation, were gross deviations from acceptable professional conduct.

100.    In the alternative, Defendants City, POLICE DEFENDANTS, and ACS DEFENDANTS failed to adopt policies requiring their employees to remove children only if they had probable cause to believe that continuing in the care of their parents/guardians presented an imminent danger to the child's life or health, only if they provided due process of law to the child and parents, and only if they had properly investigated to determine said factors. Defendants City, POLICE DEFENDANTS, and ACS DEFENDANTS knew or should have

known that said failure would cause DEFENDANTS' agents and employees to remove and detain children without probable cause to believe that continuing in the care of their mothers presented an imminent danger to the children's life or health and without due process of law, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

101.    Defendants City, POLICE DEFENDANTS, and ACS DEFENDANTS knew or should have known that their failure to adopt a policy regarding the removal of children from their parents would cause Defendants' agents and employees to violate children's and parents' rights to live together as a family without state intervention and the parents' and children's liberty interest, contrary to the Fourth and Fourteenth Amendments to the United States Constitution.

102.    Defendant CITY, through its policymakers, knew to a moral certainty that its ACS employees would confront situations that could result in unlawful removal of a child and unlawful detention of a child.

103.    Said situations present ACS employees with difficult judgments of under what circumstances are children's lives or health in imminent danger to justify removing and detaining said children.

104.    Said difficult judgments are of the sort that training or supervision will make less difficult.

105.    There is a history of ACS employees mishandling these situations, as evidenced by:

      a.    similar abuse sustained by people at the hands of NYCCS/ACS employees;

      b.    public reports and articles documenting these deficiencies authored by the

national public advocate groups, state senators and several other public agencies and officials. These reports and articles documented the systemic failure of defendants when removing children from the caretakers custody and detaining them in governmental custody;

c.  similar civil rights actions brought against defendants CITY and MATTINGLY and ACS employees for unlawful removal and unlawful detention of children;

d.  numerous complaints and substantiated reports of ACS employees abuse of power within New York City.

106.  ACS employees also have a powerful incentive to violate individuals' constitutional rights so that they may obtain federal and state funding only available to them if they meet certain requirements.

107.  The wrong choice by ACS DEFENDANT/employees when confronted with these difficult judgments will frequently cause the deprivation of a individual's constitutional rights, in that if their judgment of under what circumstances are children's lives or health in imminent danger to justify removing and detaining said children is wrong, they will have violated the caretaker's liberty interest in his/her association with his/her care and custody of his/her child, and the minor child's interest not to be unlawful seized and imprisoned, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

108.  As a result of DEFENDANTS' actions, PLAINTIFFS suffered the loss of the association with their children/grandchildren and the custody and services of her children/grandchildren; the Infant PLAINTIFFS suffered the loss of liberty and the loss of care and guidance of her parents/grandparents/guardians; and PLAINTIFFS suffered extreme

humiliation, pain and suffering, terror, mental anguish and depression.

### NINTH CAUSE OF ACTION

109.   PLAINTIFFS repeat and reallege each and every allegation as if fully set forth herein.

110.   Defendants City, ACS DEFENDANTS provided grossly inadequate and professional training and supervision to their agents and employees regarding:

      a.      Investigating child abuse and neglect cases;

      b.      Determining whether there exists probable cause to believe that continuing in the care of their parents/guardians presents an imminent danger to the children's life or health to remove or detain children;

      c.      The provision of notice and an opportunity to be heard prior to the removal of children; and

      d.      The constitutional rights of parents and children in child welfare investigation.

111.   Defendants City, ACS DEFENDANTS knew or should have known that their employees were improperly trained and supervised in said issues.

112.   Defendants City, ACS DEFENDANTS knew or should have known that their employees would confront said issues in their work and that, without training, would make the wrong decision on said issues.

113.   By reason of their lack of training, Defendants City, ACS DEFENDANTS improperly ordered the removal of the Infant PLAINTIFFS from the custody of the PLAINTIFFS.

114.   By reason of their lack of training, Defendants City, ACS DEFENDANTS

detained Infant PLAINTIFFS from their parents/guardians without adequate notice to PLAINTIFFS, without adequate investigation, without probable cause and without due process of law in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

115.   Upon information and belief, Defendant City of New York failed to discipline ACS DEFENDANTS for the unconstitutional conduct against PLAINTIFFS.

116.   Defendant CITY'S deliberate indifference in hiring, training, supervising and disciplining the DEFENDANTS directly and proximately caused PLAINTIFFS' suffering in the loss of association with their children/grandchildren and the custody and services of her children/grandchildren; Infant PLAINTIFFS suffering in the loss of liberty and the loss of care and guidance of their parents/guardians/grandparents; and both PLAINTIFFS suffering extreme humiliation, pain and suffering, terror, mental anguish and depression.

### TENTH CLAIM
### Monell Claim

117.   The acts complained of were carried out by the aforementioned POLICE DEFENDANTS in their capacities as POLICE OFFICERS and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and NYPD, all under the supervision of ranking officers of the NYPD.

118.   The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers'

jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

119.    At the time of the aforementioned constitutional violations, the City and NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part "infra", the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

120.    The existence of aforesaid unconstitutional customs and policies may be inferred from **repeated occurrences of similar wrongful conduct**, as documented by the following civil rights actions and parallel prosecutions of police officers:

   a.    Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y)(police officer who exposed a precinct's polices and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

   b.    Long v. City of New York, 09-CV-6099 (AJK)(S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

   c.    Taylor-Mickens v. City of New York, 09-CV-7923 (RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint review Board against the precinct);

d.  <u>Lin v. City of New York</u>, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e.  <u>Colon v. City of New York</u>, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

> 'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'

f.  <u>People v. Arbeedy</u>, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators.  Seeing it so much, it's almost like you have no emotion with it.  The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway.  That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. <u>Williams v. City of New York</u>, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i. <u>MacNamara v. City of New York</u>, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. <u>McMillan v. City of New York</u>, 04-cv-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CL) (E.D.N.Y.)(same);

l. <u>Smith v. City of New York</u>, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. <u>Powers v. City of New York</u>, 04-CV-2246 (NGG) (E.D.N.Y.)(police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n. <u>Nonneman v. City of New York</u>, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p. <u>Barry v. City of New York</u>, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q.  White-Ruiz  v. City of New York, 93-CV-7233 (DLC) (MHD), 983
    F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an
    "unwritten policy or practice of encouraging or at least tolerating a pattern
    of harassment directed at officers who exposed instances of police
    corruption"); and

r.  Ariza  v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis
    20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments
    and harassment in response to his allegations about a racially-
    discriminatory workplace; on motion for summary judgment, the Court
    held that the police officer had established proof of both a widespread
    usage of policy to regulate against police officers who exposed police
    misconduct and a failure to train in the police department).

121.  The existence of the aforesaid unconstitutional customs and practices, **specifically
with regard to the practice or custom of officers lying under oath, falsely swearing out
criminal complaints or otherwise falsifying or fabricating evidence**, are further evidenced,
inter alia, by the following:

a.  The Mollen Commission concluded that police perjury and falsification of official
    records is probably the most common form of police corruption facing the
    criminal justice system.  It concluded:

    > Regardless of the motives behind police falsifications, what is
    > particularly troublesome about this practice is that it is widely
    > tolerated by corrupt and honest officers alike, as well as their
    > superiors.  Corrupt and honest officers told us that their supervisors
    > knew or should have known about falsified versions of searches and
    > arrests and never questioned them.[1]
    >
    > {…}
    >
    >
    > What breeds this tolerance is deep-rooted perception among many
    > officers of all ranks within the Department that there is nothing
    > really wrong with compromising the facts to fight crime in the real
    > world.  Simply put, despite devastating consequences of police
    > falsifications, there is a persistent belief among officers that it is
    > necessary and justified, even if it is unlawful.  As one dedicated
    > officer put it, police officers often view falsification as, to use his
    > words, "doing God's work" – doing whatever it takes to get the
    > suspected criminal off the streets.  This is so entrenched, especially

---

[1] Mollen Commision report, p.36

in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."[2]

b.   In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards."  Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions  "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

c.   In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel.  The suspect was released.[4]  Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[5]

---

[2] Mollen Commission Report, pp 40-41.

[3] Melissa Grace, *NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal*, Daily News, June 27, 2011, available at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288

[4] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.

[5] Id.

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses.  The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids."  The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e. In December 2009, two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau.  As explained in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources.

> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

> To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting…

> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.

> The officers were indicted for felony perjury, filing a false report and filing a false instrument.[7]

---

[6] John Marzulli, *Claims of Corruption in Queens Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352.

[7] Id.

f.      In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[8]

g.      Separate grand jury investigations into drug-related police corruption in the Bronx; and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand · jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[9]

122.    Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

a.      Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[10]

b.      An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "'The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted

[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer*, N.Y. Daily News July 30, 2010, available at http://www.nydailynews.com/ny_loca1120l0/07/30/2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[10] Jim Hoffer NYPD Officer claims pressure to make arrests WABC ·TV Eyewitness News, March 22010, available at http:J/abclocal.go.com/Wabc/story?section=news/investigators&id=73053S6 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[11]

c.    NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss; to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing.  You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing till (sic) then."[12]

d.    The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring. [13]Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas. [14]

e.    In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[15]

f.    In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino

---

[11] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas,* N.Y. Daily News, March 3, 2011.

[12] Id.

[13] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010.

[14] Tom Namako and Kirsten Fleming, *Nightime Riders in Big Sit Fit,* The New York Post. December 26, 2009, available at http://www.nypost.com/p/news/11/space_hogs_lapped_on_empty_subways.

[15] Rocco Parascandola, *Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas,* N.Y. Daily News, Dec. 12, 2010,  available  at  http://www.nydailynews.com/news/12_bklyn_cops_threaten_tixwriting_boycott.

also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[16]

g.    Capt. Alex Perez, the second in command at the NYPD's 8151 Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[17] Ultimately, the jury in that case judged that the police and a policy "regarding the number of arrests officers were to make that violated PLAINTIFFS constitutional rights and contributed to her arrest."[18]

h.    The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations; three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[19]

i.    Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> 'You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states.

---

[16] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79'h Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15,2010, available at http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya_deputy.html.

[17] William J. Gorta, *Brooklyn Mom's Suit. Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15,,2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. l5, 2011, at 20, also available on Westlaw at 20 WLNR 2986205.

[18] Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19, 2011; available at http://www.nydailynews.com/news/ny_crime/201 J/02119/2011-02.

[19] *New York City Ticket Quota Confirmed, Denied,* The Newspaper.Com, January 21, 2006, available at http://www.thenewspaper.com/news/09/914.asp; *see also,* Kirsten Cole. *NYPD's Bogus Little Secret: Parking ticket Quotas-Agents Often Caught Citing You For Violations You Didn't Commit;* WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html.

Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher.[20]

123.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, inter alia, by the following:

a.    With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that PLAINTIFFS challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[21] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

b.    The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:
In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at

---

[20] Allison Gendar *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, available at http://www.nydailynews.com/news/ny_crime/2007/11/14/214 _nypd_captain_allegedly_caught_in_arrest.
[21] Id. at *34.

least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[22]

c.     Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d.     In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[23]

e.     In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[24]

f.     Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[25] When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter

---

[22] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commissiono/%20-%20NYPD.pdf.

[23] Loren Yaniv and John Marzuli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

[24] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements*, N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

[25] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[26]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by he NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[27]

124.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a.    In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.[28]

b.    In <u>Griffin v. City of New York</u>, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.[29]

c.    Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

---

[26] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009 at A19.

[27] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[28] Al Baker, *Bronx Police Precinct Accused of Using Quota System*, N.Y. Times, Feb. 24, 2012, available at http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.

[29] Id at 389-92. <u>See also</u> Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times, June 25, 2012, available at http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.

d.      In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the  "code of silence" in the NYPD;

e.      Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

125.    The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including without limitation, Commissioner Kelly.

126.    The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers  for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

127. All of the foregoing acts by defendants deprived PLAINTIFFS of their federally protected rights, including, but limited to, the constitutional rights enumerated herein.

128. Defendant City knew or should have known that the acts alleged herein would deprive PLAINTIFFS of their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

129. Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

130. Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

131. The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest PLAINTIFFS without probable cause and then fabricate and swear to a false story to cover up their blatant

violations of PLAINTIFFS' constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of PLAINTIFFS' rights.

132.    PLAINTIFFS' injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

133.    As a result of the foregoing, PLAINTIFFS ere deprived of their liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFFS respectfully requests judgment against Defendants as follows:

> A) Compensatory damages against all defendants, jointly and severally;
>
> B) Punitive damages against the individual defendants, jointly and severally;
>
> C) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and
>
> D) Such other and further relief as this Court deems just and proper.

DATED:      August 29, 2014
               New York, New York

                      _____/s/_____
                      Katherine E. Smith
                      The Law Office of Katherine E. Smith
                      495 Henry Street, #159
                      Brooklyn, New York 11231
                      (347) 470-3707
                      katiesmithnylaw@gmail.com

                      *Attorney for PLAINTIFFS*